Good morning, may it please the Court, Tripp Johnson, the Federal Defenders, on behalf of Alfonso Camacho, the Appellant. At the outset, I'd like to concede this is my first argument before the Court, so I'll remind myself to keep an eye on the clock and try to reserve a few minutes for rebuttal. Okay. I think it's important for the Court to understand at the outset that this is a case about the Fourth Amendment protections involving intrusions on the person. This is important to understand because here we have a situation where, quite frankly, we wouldn't be here today if the government had made the very simple step of taking Mr. Camacho out of the car and removing him and putting him at a safe distance before using the buster, a radioactive device. And the alternative to the degree that the government would need or feel compelled, the agent would feel compelled to use this device while Mr. Camacho was still in the car. It's imperative that that agent at least generate reasonable, articulable suspicion before using such a device that has the potential for harm. Counsel, are you suggesting that this is non-routine only if Mr. Camacho is not taken out of the car? Your Honor, I think after Okafor, we do have to concede that this is about the person. In Okafor, the Court did say that the X-raying of luggage was an acceptable practice without reasonable suspicion of the border. But here the concern and the difference is that we do have a person and we do have the potential for harm to that person. And here's where Melina Terzan becomes instructive in terms of what is a non-routine search. Okay. But then just so we understand that what you're narrowing this down to then seems to be the danger factor. Correct? Because if he's not in the car, well, there's clearly no intrusion. And are you giving up on the psychological fear since he wouldn't be in the car? So all that it does come down to is whether or not he would be exposed to some kind of radiation that could drift from wherever it's used to where he's sitting as the occupant of the car. Your Honor, I'm not conceding that the potential for danger is the only factor. In fact, I think the fear factor is extremely relevant to this case. And furthermore, I think there's even the use of force in this case. If we are going to look at the Melina Terzan framework, and I remind the Court that that framework is non-exhaustive, that there are other factors we should look at. We do have the potential for fear when someone is being exposed to a device that must be registered with the Nuclear Regulatory Commission. Well, I didn't state it quite right. And you're correct that danger and fear if he's in the car. What I was really driving at is so if he's out of the car, the fact that somebody has radiated his car, you're not arguing. And that would still be a factor. It really comes down to whether or not there's some danger and fear associated with being proximate. And that means being in the car while it's being examined. That's correct, Your Honor. After Okafor, I don't think that we can make that argument, although we're not conceding that there are instances where the mere use of force alone could be enough to create a non-routine search. So that's not this case. Buster throws off a tremendous amount of radioactivity, less than a smoke detector, right? Well, Your Honor, I can't. Because it throws off a minor amount of radioactivity, less than a smoke detector. Well, Your Honor, I would characterize that as a loose analogy by the government's expert in the case on the record below. He compared it to a smoke detector. He also compared it to the range finder on a camera, which doesn't use radioactivity. There's nothing in the record to indicate that a smoke detector does use radioactivity. But what we do have at that time is a device that had to be registered with the Nuclear Regulatory Commission, a device that does contain radiation and emits radiation. Now, conceivably, in this case, there was the record shows that the buster that was tested by the expert admitted negligible amounts of radiation, amounts of radiation that fall within the safe parameters set by the regulatory commission. But what the record does not have is an instance of the of a testing of the actual buster used in this case. And also the only buster that was tested was one that presumably is functioning and is emitting only the required or appropriate amount of radiation. But we don't go through the radio. When you go through the airport and there's you get the line and go through the through that. Does that emit any radiation? Do you know? Well, it's not on this record, Your Honor. But if you're referring to the magnometer, I know that that's the one you walk through is simply emitting an electric field, not a radioactive field. But it's always right next to a device whereby they're they're X-raying the luggage, isn't it? And I think there are important distinctions between an X-ray machine like we have here out at the entrance of the courthouse. And what we have in this case here, an X-ray machine is a fixed object that is focusing X-rays within a controlled box area onto onto the object of the search itself. Whereas here we have a handheld device. This directional can be pointed in any direction. And also should be noted that the X-ray and this was in the record, I believe X-rays can be turned on and off. Barium is always emitting radiation. And the only thing preventing it from emitting radiation is the tungsten shell that we have on the buster. So if we do contemplate the fact that some of these busters may not be functioning, maybe leaking, may have maybe emitting more radiation than they're supposed to. Then we have a situation where there's no switch that we turn it on and off. We have a situation where radiation is. Do you have any evidence in the record that busters are malfunctioning? Your Honor. And this is where Malina, I think, is very instructive. It's if a device is used over and over, you don't have to have harm every time. It's the potential for harm. And again, what is the potential for harm here? Counselor, the potential for harm would be emissions of radiation on the person. And what does the record say about the amount of radiation that would be emitted? Let's say in an accident, an accidental exposure to a buster. The record is silent as to that. But the Ninth Circuit has actually addressed this issue in Ninth States versus Eck. It is said that radiation, and in that case we were talking about x-rays, is harmful. I note that in Malina-Tarazan. Irrespective of the amount of the size of the source or of the particular element that we're exposed to. So if we're talking about americium, then that's the same as whether it's barium or radium on a watch dial. Is that right? Well, Your Honor, certainly different types of radioactive materials may emit different amounts of radiation. But the concern is always there that people are unnecessarily being exposed to large amounts or unnecessary amounts. How do we know that they're large amounts? The expert witness testified that this was licensed by the NRC. In other words, the NRC has approved this for use. When it's functioning, Your Honor. And certainly the question is... But we don't have any evidence that this buster was malfunctioning or that any other busters are malfunctioning. And again, Your Honor, it is the government's burden in this case to establish that this was a routine search or that there was reasonable suspicion. What we do have in this record is evidence of utter incapability of the agents who use this on a daily basis to maintain these busters. The only thing they're allowed to do is to change the battery in the LED readout screen. They don't check them for leaks. They don't check them to see if they're maintained. They don't even calibrate them on this record. That's the concern. And that's what we have here is people who are using it on a daily basis. And I should step back and note for context, at the time this case was litigated a year ago, the expert indicated that they had more than doubled the number of busters at the border. There were over 900 in use at the time, and he indicated they were still growing. Today, we should assume that number is larger. We have busters being used at the border, not only in the secondary areas. We have them being used even in the primary booths. I want to alert the Court to a related case that I've noted in our briefs that involves the use of a buster at the primary booth within less than two feet of a person. And that's the United States v. Hedrick. I believe that case may have been sidetracked because of a separate issue regarding consent. I don't know. The briefs have been submitted. Hedrick, H-E-T-R-I-C-K. I believe the case number is 02-50632. Well, I'm interested, as Judge Bybee obviously is, in the science of this, because there's the interesting analogy to a smoke detector. But I understand that the NRC says that the published safe exposure rate for gamma radiation, which this emits, is 2,000 microunits per hour. Correct? So there is a safe level established. Is that correct? Yes. On the record, it was indicated there were two levels. The government expert cited the 2,000 microunit or microcurry level. Well, no, wait a minute. Don't go on. So there is some baseline established in the record. At least what I saw was 2,000 microunits. Is that different from microcurry? According to the government's expert, those are interchangeable. Okay. So then on the 100 microcurry buster, the rate of exposure was 120 to 320 microunits in 10 seconds. Now, don't ever accept anything I say numerically and mathematically, because I'm a lousy mathematician. But last night I ran some numbers. And on the rate of emission, if 320 per 10 seconds, I think that's 32 per second. So if you convert that into an hourly rate of emission, it comes out something like 115,200 microunits or microcurries, if they're interchangeable. Now, I know that the expert testified that the actual exposure was around zero. So what's your view on the record as between the theoretical rate and the actual exposure? Under your theory of leakage, are you saying that if it leaks, it can drift upwards beyond the actual rate and more toward the actual exposure? Or what's the relationship between that argument and the numerical science that's here? And, Your Honor, forgive my mathematics as well, but I would submit that a leaking or damaged buster would emit more than what's emitted when we have the barium going through a small slit in the tungsten chamber. Right. But you think the record's not calculable to what that might be if there's a leakage? I can't. The Court did cite, or you did cite, Your Honor, the number that would happen if that exposure rate existed over an hour, which would certainly exceed the amount set by the NRC. And the concern is that there is a potential for fear. I mean, there is a potential for harm. There's certainly fear. But if it were leaking, it would only leak. The person most likely to be damaged by that would be the people handling it, not the person who's quickly exposed to it, right? That's correct, Your Honor, but certainly the government has exposed people in its service to risks that we never expose to civilians. Well, no, I understand that, but that's their problem. That's not Mr. Camacha's problem. The question is whether, as applied to him, whether he was exposed to some kind of dangerous radiation. And, again, in Molina-Terrazine, it's not clear that Mr. Molina's car was going to be, was going to create any danger to him or was going to hurt him. It's the potential, and it's the fact that if this is repeated enough times, that harm can result. And because these busters are not maintained, harm can occur. All right. Thank you. We'll give you a minute for a rebuttal. Thank you. Good morning, gentlemen. May it please the Court. My name is Joseph Smith. I'm an assistant U.S. attorney in the Southern District of California, and I'm representing the FLE of the United States. And I'd like to just say I want to make clear, the government seems to want to make this a test case because you are explicitly waiving the reasonable suspicion alternative ground, which would avoid the issue of whether this was a routine or non-routine search, since you would have met the standard for non-routine search in any event, according to the district court. Yes, Your Honor. But according to the district court, we wouldn't be here either because it was found to be a routine search. There's the two issues here. The one the government has waived. The reason why the government has waived this argument, there's a few reasons. First, legally, the analysis of this court should be first whether the search is routine or non-routine. Only if it is found to be non-routine should there be an analysis of reasonable suspicion. While the government believes the district court properly found there to be reasonable suspicion, the government also feels strongly that under these facts, the facts are even stronger for this court to find and much easier for this court to find than is a routine search. Reasonable suspicion in this case was a tire tap in primary inspection, followed by another tire tap in secondary inspection, followed by the fact that it was a different tire. Then the tire couldn't be removed and the buster was used. Certainly, the government feels that's reasonable suspicion. The government feels that on the facts. Why should we reach out on this record to validate the buster as a safe device across the board and say, no, the use of the buster is because of this record, which is pitifully weak on the science, I must say, that we should say that the use of the buster under the Tarazan factors doesn't come within the routine or doesn't fall within the non-routine category. I understand, Your Honor, and the government respectfully disagrees with Your Honor regarding the science in this case. I think that Your Honor made a calculation based on rate of exposure, and if I could explain that, and I think that a careful viewing of the excerpts of the record will bear this out. The rate of exposure was measured with a sensitivity meter by Richard Whitman, who was accepted by the Court as an expert in the field. He made measurements using the 100 microcurie unit. Microcuries is not directly analogous to microunits of exposure. I think that's clear in the record as well. But the 100 microcurie unit, which is the strongest unit used by Customs, he made a reading over 10 seconds. That's 7 seconds longer than the exposure in this case, in a situation much closer than what the exposure was in this case, meaning he put the buster density meter right against the panel of the passenger car and put the meter exactly on the other side. The facts bear that out as well. He said the readings from that sort of measurement were between 100 and 300 microunits of exposure. Now, that's microunits of exposure per hour. That means if the device was held there for one hour continuously, you'd get 100 to 300 microunits of exposure. And it's clear from the record because immediately after that, he explains, the actual rate of exposure is significantly lower because there's 3,600 seconds in an hour, and the exposure was only for 10 seconds. Three seconds in the actual case, 10 seconds in the test he conducted. Therefore, you would take the rate of exposure, 10 to up to 300 microunits of exposure per hour, times 10 seconds, but divide that figure by 3,600 seconds per hour, so the rate of exposure would be significantly lower. That's why he was able to find immediately after that the actual exposure would be zero. There would be no measurable exposure because it's only three seconds of exposure. Now, the NRC allows for 2,000 microunits of exposure in any given hour to the general public. In this case, there wasn't 2,000 microunits of exposure in that hour. Even if it had been applied for an hour continuously, there would only be between 100 and 300 microunits, which would have been within the NRC's regulations for the general public. In this case, it was actually zero. That's why the government feels so strongly about this device and its safety. Even, and there's been some comparison between a chest x-ray, which the courts have held is a non-routine search, and this particular device. The testimony from Mr. Whitman, uncontroverted, was that in a chest x-ray, the amount of exposure to radiation is between 50,000 and 60,000 units for a single chest x-ray. That's in the record. Now, certainly, when you look at this, even if you were to say 100 microunits, now that's microunits. That's a thousandth of a unit. That's .1 unit of radiation, even if it was used for an hour, continuously, versus 50,000 units. So you're talking about a magnitude of 500,000 different. I would say chest x-ray is non-routine. So it's somewhat comparing apples and oranges, I think. At least my concern is this, that the government postures this case as one where you want us to validate and equate the buster with the x-ray, the baggage. We've had some conversation. It's no worse than standing and going through the airport security with an x-ray machine next to you, which OCA4 accepts as okay and, therefore, doesn't convert the x-ray of the baggage into a non-routine search. I understand that. But the question I have is this is a device which is new to the jurisprudence as far as this court is concerned. And you're asking us, it appears, to validate the use of the buster apparently under all circumstances. Well, certainly, this court, what we're asking this court to do is to decide that the use of the buster device, as an absolute minimum, it was safe and it was a routine search in the context of this case. In addition to that, I think there are facts that are amply there for this court to say the use of the buster device on property, even when someone's in the vicinity of the property, is still a routine search. The problem is I have, and I'm not trying to be argumentative, I'm just trying to get my arms around this as to what the implications of ruling from us are, since you're posing this as a test case, is that when the high-tent of people, there was a theory floating around, and I don't know what got resolved in it, but the people who lived under high-tension wires were exposed to electromagnetic fields that caused them illness. And everybody laughed at that at the beginning and thought that was a bogus claim, but the science seemed to, at some point anyway, said, no, there's more to it. It needs to be studied. Maybe there's something there. The same with cell phones and the argument that if you hold cell phones too close to your ear for too long, you may have an accident. In other words, there are a number of these devices that are out there that are new, and this court is not equipped to evaluate the science definitively. What we have is the record that's in this case, and what concerns me is the government trying to turn, if you are, trying to leverage this record into a sweeping statement that busters are okay. Your consent, I take it, if we were to agree with you, we could conclude that, at least on the facts of this case, it didn't cross the line, but it might cross the line in some other circumstance. Certainly. Your Honor, I don't think there's any, there's no evidence to indicate that the second part of your proposition, Your Honor, that under other circumstances, when searching property of the buster, that it could amount to a non-routine search, because I don't think there's any facts to indicate that. And I understand, Your Honor, that you're indicating this is a novel area. The busters have been in the customs inventory for over ten years. The science of it. Because they were novel to our jurisprudence. And I apologize, Your Honor, but the science itself in radiation safety certainly has been around for quite some time. It's important to note that the defense in this case provided no counter-expert. They could not find a counter-expert. There is nothing to indicate that the testimony of Mr. Whitman is anything but accurate and complete and true. Mr. Smith, is there anything in the record from the NRC on this? The NRC, on the device itself, the device, they are under the customs license for these devices. However, as Mr. Whitman indicated, the amount of radiation involved is similar to that of a household smoke detector. I don't think that's a misrepresentation. I'm asking whether the NRC has issued any reports on busters. The NRC has not specifically released any reports. However, the NRC has published the safe exposure rates for the general public, which are magnitudes greater than any potential exposure under any circumstances in this particular case or any reasonable use of the buster device on property at the border. And another reason why the government feels strong about this issue is there are 900 devices in use at the border. As the Oak Fork case and every other Ninth Circuit case that addressed border searches has indicated, the ability of the government to search and to maintain the sanctity of its borders is something that is very important, certainly for the safety, for the national security of the country. These devices are benign. There's nothing to indicate that they have any ---- I'm assuming your conclusion. Your Honor, meaning ---- Yes. I mean, you say they're benign, but if they're not, the national security, if it were a chest X-ray, you'd still under your jurisprudence have to get ---- Certainly that. So that's what we're trying to ---- Yes, Your Honor. And that's why, I mean, I could probably spend 20 or 30 minutes talking about the facts of this case and how they clearly show the rate of exposure. And just briefly, if I could, the device itself, the testimony was that even in open air, the device, the gamma radiation is so low that it's emitted by this barium-133 source, and it's designed that way, so it's the lowest source to do the job. Within three feet of open air, there's no exposure. The actual radiation dissipates. So, I mean, even in open air at three feet distance means ---- Is a buster available on the general market? The buster is available. I wouldn't say to the general public since it's a ---- it was funded through, I mean, I'm not sure if this is in the record, but certainly from my research I know that the buster device is sold by a company and there's certain limits on who can purchase it, not because of its radiation exposure, but because of the technology and the fact that there's been some ---- it's utilized by law enforcement. So it's certainly sold to law enforcement. Are there other applications other than law enforcement applications for the buster? I'm not aware of any. It's targeted towards the law enforcement community. What it does is it just ---- it emits a low level of radiation which bounces back to the device, which gives you numerical reading. Is that technology used in the other sector? The technology ---- I mean, and that's why the Doppler weather radar and the range finder information was provided, was there was no analogy between them all using radioactive sources. What it is is they were talking about how something is emitted and it bounces back and it gives you an image or an indication of what's in front of you. That's why those two things are similar. I'm not aware of a commercial application for it. Certainly there could be commercial applications to determine whether there's voids in construction, whether or not if they pour concrete it will tell you how thick concrete is, or if there's a void behind it. So I guess if there was a technological need to look behind something in a non-destructive manner, which this is, there's no damage to the vehicle, there's no damage to automobile parts, there can be no damage. There is no force involved in this case. There's no residual radiation, no testimony about any sort of damage. In fact, that's what led the district court to conclude on all three of the factors and talked about the force, that there was no force, that there was no danger, and lastly, that there's no reasonable basis for anybody to fear the use of this device because it could not give a person any measurable radiation. As such, it doesn't even come close to NRC regulations for general use. It's certainly so different, it's not even apples and oranges between that and a chest x-ray. It's more like a Sunday afternoon flag football game versus the Super Bowl. I mean, 50,000 units of radiation and... Do you know how many people get injured in those flag football games? I think we get your argument. I believe the pay is much less. One more point. You said that the defendant could not find an expert. Well, Your Honor, I think... Is there anything in the record that they could not... I can find an expert to say there's life on Mars or there's... that power lines won't harm you or they will harm you or whatever. Is there anything in the record? You know, I didn't argue this below the district court. I argued the heck of the case. I bet the answer to that is no. I'm not sure, Your Honor, whether or not there are any continuances to give him time to do so. All right. Thank you. Just briefly with regards to the expert, it is, again, the government's burden to prove this is a routine search. The court also... But just to put the fine point on it, there's no evidence that you tried to find an expert and could not. There is no evidence of that. That's correct, Your Honor. Also with regards to reasonable... Did you present any evidence to contradict the government's expert witness? I understand you cross-examined him, but... Well, again, I'm in a similar position to Mr. Smith. I didn't argue this case well. Is there anything in the record that suggests that as defense counsel that you put anything into controversy other than cross-examining the government's witness? No, Your Honor. There was no additional evidence. You called no other expert witnesses and submitted no other reports for consideration by the district court. That's correct, Your Honor. The court also mentioned that the alternative grounds of reasonable suspicion. We're not conceding that. I'll submit on the briefs and note that Mr. Barth, my colleague, will be discussing that issue in the next case more fully with regards to topology. And finally, it doesn't matter if Mr. Camacho was actually exposed to excessive amounts of radiation. It's the potential... No, we understand that you put a potential... Potentiality argument. And the solution is simple, Your Honor. These people can be removed from their cars before devices like this are used, or the agents can do what they do best, which is generate reasonable, articulable suspicion in these devices. Thank you. Thank you. I thank counsel for the argument. The case is argued will be submitted. It is submitted.
judges: Fisher, Bybee, Mahan